UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HENRY AVOCADO CORPORATION,<br><br>               Plaintiff,<br><br>— against —<br><br>Z.J.D. BROTHER, LLC and<br>LONG ZHONG "MICHAEL" CHEN<br><br>             Defendants. | **17-cv-4559 (ARR) (RLM)**<br><br><br>**Opinion and Order**<br><br><br>**Not for electronic or print<br>publication** |

ROSS, United States District Judge:

Between April 24, 2017 and May 11, 2017, Henry Avocado Corporation ("plaintiff," "Henry," or "Henry Avocado"), an avocado distributor based in California, shipped 79,000 pounds of avocados to New York. Though both parties acknowledge that Henry has not yet been paid for these avocados, the identity of the debtor is the subject of considerable dispute. According to Henry, the avocados were sent to New York at the request of Z.J.D. Brother, LLC ("Z.J.D."), a company that distributes food to sushi restaurants in New York. Z.J.D., by contrast, asserts that the produce was ordered by Johnny Avocado Incorporated ("Johnny" or "Johnny Avocado"), a third-party avocado wholesaler located in New York. Z.J.D. maintains that it never contracted with Henry directly, and its only role in the relevant transactions was to advance funds to Johnny so that Johnny could continue to supply avocados to Z.J.D. and its other customers.

In August 2017, Henry filed suit against Z.J.D. and its owner, Long Zhong "Michael" Chen (collectively, "defendants"), under the Perishable Agricultural Commodities Act ("PACA"). I denied defendants' motion to dismiss plaintiff's complaint in December 2017, and the parties proceeded to discovery. Now, both parties have filed cross motions for summary judgment. Because all of plaintiff's claims turn on disputed questions of fact regarding the nature of the

produce shipments, the underlying expectations of each party, and the communications between the parties, the motions are denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Henry Avocado Corporation is a California-based company that markets and distributes avocados to food service and retail customers across the United States. *See* Pl.'s 56.1 ¶¶ 1–2, ECF No. 59-2. At all relevant times, Henry was "licensed by the United States Department of Agriculture . . . to buy and sell wholesale quantities of perishable agricultural commodities in interstate commerce under the Perishable Agricultural Commodities Act of 1930." *Id.* ¶ 42. Z.J.D. Brother, LLC is a New York-based corporation whose president and principal shareholder is Long Zhong "Michael" Chen. *Id.* ¶¶ 3–5. The parties dispute nearly all elements of the transactions that form the basis for this lawsuit. Thus, I describe each party's version of the facts separately.

### A. Plaintiff's Account

After learning that Z.J.D. wished to order avocados from Henry on credit, Christopher Varvel, a salesman for Henry, asked Diane Brownell, Henry's accounts receivable manager, to send Z.J.D. a Customer Information Sheet. *See* Pl.'s Br. Ex. 1 ¶¶ 2, 8, ECF No. 59-1 ("Varvel Decl. 1"); Brownell Decl. ¶ 1, ECF No. 61-3. Henry requires all potential customers to complete this form before they can begin ordering avocados from the company. *See* Varvel Decl. 1 ¶ 9; *see also* Pl.'s Br. Ex. A, ECF No. 59-1 ("Customer Information Sheet"). According to Henry, the only reason that Z.J.D. was required to complete this form was to allow Henry to "assess Z.J.D.'s credit risk." Varvel Decl. 1 ¶ 10; *see also* Varvel Decl. 2 ¶ 9, ECF No. 61-2 (asserting that it would not make sense for Henry Avocado to "require Z.J.D. to complete a Customer Information Sheet in order for another company . . . to buy avocados on [Z.J.D.'s] credit").

Chen completed and signed the form in his capacity as the owner and president of Z.J.D.

and returned the form to Henry. Pl.'s 56.1 ¶ 9; *see also* Customer Information Sheet. The form contained information about Z.J.D.'s business and banking practices, and it included a list of three credit references. *See* Customer Information Sheet. After receiving the completed form, Brownell "personally contacted the references listed by Chen" and proceeded to "extend[] credit terms to Z.J.D." Brownell Decl. ¶¶ 8, 13. She "personally spoke to Chen . . . . [to] confirm[] that Henry Avocado was extending credit to Z.J.D. to purchase avocados and that Henry Avocado expected payment in full from Z.J.D." *Id.* ¶ 14.

On March 6, 2017, Henry shipped 38,000 pounds of avocados from Laredo, Texas to Z.J.D.'s Flushing, New York address. Pl.'s 56.1 ¶ 14–15.[1] While the shipment was in transit to Z.J.D., Deer Trucking Corporation, the freight carrier shipping the avocados, called Chen "to confirm a time for delivery." Varvel Decl. 1 ¶ 13. When Chen learned that the avocados were on their way to Z.J.D.'s warehouse, he contacted Varvel and asked that the order be redirected to Johnny Avocado, "a dealer of fresh fruits and vegetables in Oceanside, New York, which itself was a customer of Henry Avocado." *Id.* Varvel complied, and the avocados were accepted without objection at Johnny's address in Oceanside, New York. Pl.'s 56.1 ¶ 17. On March 8, 2017, Henry sent an invoice in the amount of $68,620 to Z.J.D.'s mailing address. *Id.* ¶ 18; *see also* Pl.'s 56.1 Ex. B, ECF No. 59-2 ("Mar. 8, 2017 Invoice"). The invoice listed Z.J.D. as the purchaser of the avocados, and Johnny as the party to whom the avocados were shipped. *See* Mar. 8, 2017 Invoice.[2]

---

[1] Both parties acknowledge that this initial shipment is not part of the instant action, as Henry Avocado has been paid in full for the cost of the avocados shipped on this date. *See* Pl.'s 56.1 ¶ 18–22; *see also* Defs.' Reply in Supp. 7, ECF No. 64. Because plaintiff admits that it was paid for this order and does not assert that the details of that transaction establish a "course of dealing" between the parties that can be used to infer the existence of subsequent contracts, *see* Pl.'s Opp'n 9–10, ECF No. 61, defendants argue that this shipment is irrelevant. I include the details of this transaction only for the purpose of providing a complete picture of the parties' relationship.

[2] As I explain further below, defendants assert that they never received a call from the freight carrier, and they argue that they never made any requests to Henry regarding this shipment or the address where it

Henry subsequently received two checks drawn on Z.J.D.'s bank account—the first, dated March 4, 2017, was for $38,300, and the second, dated March 23, 2017, was for $37,000. *See* Pl.'s 56.1 ¶ 19; Pl.'s 56.1 Ex. C, ECF No. 59-2.[3] Collectively, the two checks exceeded the amount of the March 8, 2017 invoice by $6,680, and on April 4, 2017, Henry mailed a refund check in that amount to Z.J.D.'s Flushing mailing address. *See* Pl.'s 56.1 ¶ 20; Pl.'s 56.1 Ex. D, ECF No. 59-2.

On March 25, 2017, Chen's son spoke with Varvel and asked if it would be possible for Z.J.D. to order additional shipments of avocados from Henry. *See* Varvel Decl. 1 ¶ 19. Before authorizing additional sales, Varvel spoke with John Gouzos, the President of Johnny Avocado, to inform him that Z.J.D. was interested in purchasing avocados directly from Henry. *Id.* ¶ 20. Though Johnny and Henry did not have a formal non-compete agreement, Varvel considered it a "business courtesy" to inform Johnny of this arrangement, since Johnny was an existing customer of Henry's and Henry was aware that Z.J.D. was a customer of Johnny's. *Id.* Henry subsequently shipped two more loads of avocados at Z.J.D.'s request—both of which were also sent to Johnny's address. *Id.* ¶¶ 21–22, 25 (noting that "[i]t is not uncommon for produce buyers to direct their suppliers to ship to third parties"). These two shipments are at the core of the instant dispute: the first was shipped on April 24, 2017 and contained 40,000 pounds of avocados, and the second was shipped on May 11, 2017 and contained 39,000 pounds of avocados. *See* Pl.'s 56.1 ¶¶ 23–32.

---

should be sent. *See* Defs.' 56.1 Resp. ¶ 16, ECF No. 62. They also argue that the timeline described by plaintiff is impossible because the invoice contains the correct delivery destination and was allegedly issued just two days after the avocados were ordered. *Id.* However, neither party provides information about Henry's invoicing practices, the date on which the phone call was made, or the date that the avocados were actually received at Johnny's Oceanside address. As I explain below, I find that plaintiff's description of this call—when viewed in the light most favorable to plaintiff—would support the inference that defendants had sufficient ownership and control over the avocados to satisfy plaintiff's PACA claims.

[3] Plaintiff does not indicate whether it received these checks by mail or in person. As I explain below, Z.J.D. asserts that it never delivered these checks to Henry, and that it was actually Gouzos who provided them to Henry as payment for orders made by Johnny Avocado.

Before the April 24, 2017 and May 11, 2017 orders were shipped, Varvel "spoke with Chen by telephone to confirm [that the avocados] were ordered by or with his consent." Varvel Decl. 1 ¶ 28; *see also* Pl.'s 56.1 ¶ 36. Specifically, Varvel alleges that he spoke with Chen twice before the April 24, 2017 order was shipped—first on April 19, 2017, and again on April 20, 2017. Varvel Decl. 1 ¶ 28. He alleges that the dates of these calls—which took place a few days before the April 24, 2017 order—are "consistent with the timeframe required to source . . . [a]vocados from Mexico" because it "normally takes four (4) to seven (7) days once an order has been placed to source product from Mexico to Henry Avocado's shipment point in Laredo, Texas." *Id.* Varvel also asserts that he spoke with Chen again on May 5, 2017, "six days before the May 11, 2017" order, and that this "call [also] fit within the timeframe for sourcing the [product]." *Id.* ¶ 29.

Varvel's phone records confirm that communication between the parties took place on these dates. Pl.'s Br. Ex. 3, ECF No. 59-1 ("Phone Records"). On April 19, 2017, the phone records reveal that Varvel received an incoming call from 917-302-5607 at 11:44 A.M., and the call lasted five minutes. *Id.* On April 20, at 6:47 A.M., Varvel had a two-minute phone call with the same number, and on May 5 at 4:51 P.M., he had a four-minute phone call with the same number. *Id.* Plaintiff alleges that these phone records demonstrate that Z.J.D. purchased the avocados that were shipped to Johnny, and that Z.J.D.—and not Johnny—is responsible for the debt owed to Henry. *See* Pl.'s 56.1 ¶¶ 36–41. In his deposition, Chen confirmed that 917-302-5607 is his cell phone number, *see* Pl.'s Br. Ex. 2, at 61:14–18, ECF No. 59-1, though, as I explain further below, he disputes the nature of the calls between the parties and adamantly contests plaintiff's assertion that he ordered any avocados during those calls.

Henry mailed Z.J.D. invoices after each of these two orders. *See* Pl.'s 56.1 ¶¶ 27–28, 33–34; *see also* Pl.'s 56.1 Exs. E–F, ECF No. 59-2. Like the March 8, 2017 invoice, these two invoices

list Z.J.D. as the purchaser of the avocados. Pl.'s 56.1 Exs. E–F, ECF No. 59-2. The April 24, 2017 invoice lists Johnny as the recipient of the avocados, but the May 11, 2017 invoice does not include a recipient. *Id.* The April 24, 2017 invoice is for $91,940, and the May 11, 2017 invoice is for $82,160. *Id.* Both invoices contain a boxed section at the bottom explaining that the avocados "are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act," and providing that the buyer of the avocados "agrees to pay all reasonable attorney's fees, together with any costs and expenses" in the event that Henry commences "any action or proceeding . . . to enforce the terms of" the transaction. *Id.* The invoices also explain that the buyer will be responsible for interest "at the rate of 1.5% per month (18% per annum)" for any past-due charges. *Id.*

Z.J.D. has not paid Henry for either the April 24 or May 11 shipments of avocados, Pl.'s 56.1 ¶¶ 29, 35, and Henry claims damages of $174,100, plus attorneys' fees, costs, and pre-judgment interest. *Id.* ¶¶ 44–45.

## B. Defendants' Account

According to defendants, Z.J.D. never ordered avocados from Henry; instead, at all relevant times, Johnny Avocado was Z.J.D.'s sole supplier of avocados. *See* Chen Decl. ¶¶ 2–3, ECF No. 62-2. On July 20, 2016, Chen gave Johnny a $200,000 loan after John Gouzos, the principal of Johnny, informed Chen that he "was having cash flow problems." Chen Decl. ¶¶ 3, 5; Chen Dep. 26:4–27:19, ECF No. 62-1. The details of this check are a bit unclear, but it seems that Chen provided the advance to Johnny to assist Gouzos and his business partner in starting their avocado business. *See* Chen Dep. 24:5–27:5. As part of Chen's arrangement with Johnny, Gouzos gave Chen stock in Johnny's avocado supply business and agreed to reimburse Chen for the $200,000 loan at a rate of $6,000 or $7,000 per month. Chen Decl. ¶ 5; Chen Dep. 26:22–27:10.

Gouzos apparently kept his promise for several months, but, at some point, Chen stopped receiving reimbursement checks from Johnny; as of October 2018, Johnny still owed Chen $135,000 on the initial $200,000 loan, which Chen had provided to Gouzos without interest. *See* Chen Dep. 24:23–25, 26:22–27:10.

Around this same time, Gouzos also began supplying avocados to Z.J.D. at a discounted, wholesale rate. Chen Decl. ¶ 5 ("As part of the parties' agreement, for a period of time ending on April 15, 2019, Johnny would deliver to ZJD a maximum of 12 pallets of avocados . . . at Johnny's actual wholesale cost including the cost of delivery."). From September 7, 2016 through March 1, 2017, Z.J.D. received avocados from Johnny pursuant to this agreement. *See id.* ¶ 6. Chen paid Johnny a total of $217,911 for avocados during this time period, in addition to the previously-mentioned $200,000 loan. *Id.* ¶¶ 5–6; *see also* Chen Decl. Ex. A, ECF No. 62-2 (providing copies of checks from Z.J.D. to Johnny during the relevant time period). Though Chen received avocados in exchange for this money, he believes that some of the funds he provided Johnny were actually used by Johnny to supply avocados to its *other* customers. Chen Decl. ¶ 6. Thus, Chen asserts that Johnny remains indebted to Z.J.D. in an amount in excess of $135,000, though the exact amount of the debt is not clear from the record. *See, e.g.*, Chen Decl. ¶¶ 5–7 ("Between September 2016 and March 2017, ZJD and I had provided funds of more than $400,000 to Johnny so that Johnny could order avocados from Henry and sell them to ZJD."); Chen Dep. 25:2–24 (testifying that Chen expected Gouzos to reimburse him for the advance in addition to "the amount that [Gouzos] owed [him] . . . for previous transactions"), 30:5–17 (explaining that he is not able to answer how much money he advanced to Johnny because the question is "a little bit complicated"); *see also* Chen Dep. 80:18–81:17 (explaining that Chen paid Johnny for quantities of avocados that he never received).

In early 2017, Gouzos contacted Chen again to inform him that Johnny Avocado's "cash flow problem[s]" had persisted. Chen Decl. ¶ 4. Instead of asking for an advance directly from Chen, however, Johnny asked Chen to complete Henry Avocado's credit application on behalf of Z.J.D. *Id.* Chen did not appear to fully understand the terms of this arrangement; he signed the blank Customer Information Sheet that Gouzos gave him because he "trusted" Gouzos, despite the fact that he did not read or comprehend the language on the application. *See* Chen Dep. 43:9–46:4. Chen did not understand that Gouzos intended to use the form to obtain avocados on Z.J.D.'s credit. Instead, he simply thought that he needed to complete the form so that Henry would agree to "accept JZD's [sic] checks [as] payment for Johnny's orders." *See* Chen Decl. ¶ 8; *see also* Chen Dep. 43:13–25. Chen testified that he personally completed just two parts of the Customer Information Sheet himself: the signature and printed name sections. *See* Chen Dep. 39:12–42:13, 45:20–46:4. Everything else on the form, including the sections with Z.J.D.'s banking information and credit references, was completed by Gouzos. *Id.*

At Gouzos's request, Chen provided Gouzos with a blank check which Gouzos filled out in the amount of $38,000 and gave to Henry. *Id.* at 34:2–9, 32:19–33:11. A few weeks later, Chen gave Gouzos another check in the amount of $37,000; this check, dated March 23, 2017, was filled out by Chen and made payable to Henry Avocado, though it was delivered to Henry by Gouzos rather than Chen. *Id.* at 35:20–37:8. Chen testified that he never sent a check directly to Henry, though he acknowledged that he received a reimbursement check of $6,680 from Henry. *Id.* at 37:9–23; *see also* Pl.'s 56.1 Exs. C–D. Though Chen admits that the two checks he provided to Gouzos were used by Johnny to pay Henry for the avocados that Johnny delivered to Chen, he denies that Z.J.D. ever placed an order with Henry. *See, e.g.*, Chen Dep. 50:23–51:4. He also testified that he never received the March 8, 2017 invoice from Henry in the mail, though he admits

that he saw that invoice atop a pile of papers at Johnny's office. *Id.* at 52:3–24. Finally, Chen refutes Henry's assertion that he contacted the company to ask that it redirect the shipment of avocados to Johnny's Oceanside address; he asserts that he "never placed the order [himself]," so he would have had no "opportunity to tell them not to ship [the avocados] to [his] company." *Id.* at 53:8–13. Chen also asserts that he does not believe that his "English is up to the level to be able to communicate" a direction of this kind in a business relationship. *Id.* at 53:14–19.

Unbeknownst to Chen, Gouzos continued to order avocados from Henry using Z.J.D.'s credit. Chen testified that he never received the invoices that represent those orders: the April 24, 2017 invoice for 40,000 pounds of avocados and the May 12, 2017 invoice for 39,000 pounds of avocados. *See* Chen Dep. 51:17–55:2; *see also* Pl.'s 56.1 Exs. E–F. As stated above, these two orders—and not the March 6, 2018 order, for which Henry has already been paid—are the subject of the instant dispute. Chen believes that Johnny purchased these avocados without his consent or authorization, using Z.J.D.'s credit with Henry to complete the transaction without his knowledge. Chen Decl. ¶ 8.

During this same time period, Chen continued to pay Johnny directly for avocados that Z.J.D. received from Johnny, unaware that his company's credit was simultaneously being used by Johnny to purchase those same avocados. *Id.* ¶ 9 –10; *see also* Chen Decl. Ex. D, ECF No. 62-2 (providing invoices from Johnny Avocado to Otoro Fish in various amounts, all stamped "Paid").[4] Chen asserts that he paid Johnny $59,119 for 27,650 pounds of avocados from April 24,

---

[4] Though Johnny Avocado's invoices list "Otoro Fish" as the party to whom the avocados should be billed and shipped, Chen asserts that these invoices represent sales of avocados from Johnny Avocado to Z.J.D. *See* Chen Decl. ¶ 10. Chen testified that Otoro Fish was a company he operated before he opened Z.J.D., and that he worked with Johnny in his capacity as owner of Otoro Fish before he opened Z.J.D. *See* Chen Dep. 16:21–25. On the Customer Information Sheet provided to Henry, Z.J.D. Brother LLC is listed as the parent company and the name that should be included on the company's checks, but Otoro Fish is also listed on the form as the "type of business" operated by Z.J.D. *See* Customer Information Sheet; *see also* Mar. 8, 2017 Invoice.

2017 through June 2, 2017, though he actually received just a portion of the avocados for which he paid Johnny. Chen Decl. ¶ 10 (explaining that many of the avocados Z.J.D. ordered from Johnny were "sold by Johnny to customers other than ZJD"). Chen also argues that he would never have ordered the avocados in the April 24 or May 12, 2017 invoices from Henry, since it would have been illogical for Z.J.D. to have "committed to paying twice for the same avocados." *Id.* ¶ 9.

Finally, Chen has an alternative explanation for the phone records that Henry provides in support of its argument that Chen placed the April 24 and May 11 orders directly with Henry. Though Chen admits that he spoke with representatives of Henry occasionally over several months, he asserts that none of those phone calls were made for the purpose of initiating or confirming an avocado supply order. *See* Chen Dep. 60:3–25, 65:3–21. Instead, Chen alleges that he called Henry in April and May of 2017 so that he could confirm the price of the avocados that Henry was supplying to Johnny. *Id.* at 60:11–25. He testified that Johnny Avocado communicated to Chen that it would supply avocados to Z.J.D. at a discounted rate, equal to the price that Johnny was being charged by Henry. *Id.* Thus, Chen called Henry in order to ensure that the price Henry was charging Johnny was the same as the price that Johnny was charging Z.J.D. *Id.*[5] Chen also alleges that both parties were aware at all times that Johnny Avocado was the buyer of the avocados, not Z.J.D. *Id.* at 65:12–66:20. In fact, Chen alleges that Henry informed him that Z.J.D.

---

[5] Defendants argue that the times during which the calls between Chen and Henry took place—as reflected in the phone records provided by plaintiff—further demonstrate that Chen never placed any avocado orders by phone. *See* Defs.' 56.1 Resp. ¶ 39 (arguing that "[i]t is not credible that business was conducted during these calls" because one of the calls allegedly took place at 3:47 A.M. in California). This argument is mystifying, as Chen himself admits that he placed calls to Henry around this time and, in his deposition, he did not dispute the times that appear on the phone records, *see* Chen Dep. 60:3–25, 65:3–21. Furthermore, while the phone records are not a model of clarity, defendants seem to misunderstand their meaning. The phone records indicate that "[t]he date and time corresponds to the local time where the mobile was located." *See* Phone Records 3. Thus, the call that originated from Varvel's phone number in Escondido, California on April 20, 2017 was actually placed at 6:47 A.M. California time, *not* 3:47 A.M. California time. *Id.* at 1. This interpretation of the records is further confirmed by the fact that the records for Chen's cell phone indicate that the same call was received on Chen's New York-based phone number at 9:47 A.M. New York time, representing the three-hour time difference between New York and California.

could *not* purchase avocados directly from Henry, since "only Johnny Avocado from New York can be the buyer" of Henry's produce. *Id.* at 66:6–15. Chen admits that he also called Henry on several other occasions, but these calls were made after Chen received statements from Henry indicating that Z.J.D. owed Henry $174,100 in overdue payments for the April and May invoices. *See* Chen Dep. 59:24–60:6; *see also* Chen Decl. Ex. F, ECF No. 62-2 (providing overdue payment statements from Henry to Z.J.D. dated April 30, 2017 and May 31, 2017). Defendants acknowledge that Z.J.D. never paid Henry the amounts due on those two invoices, but they assert that Johnny—and not Z.J.D. or Chen—is the debtor responsible for those payments. *See* Defs.' 56.1 Resp. ¶ 45, ECF No. 62; *see also id.* (arguing that Z.J.D. "paid Johnny Avocado for all of the avocados that are the subject of this action" and that, if anyone owes money to Henry, it is Johnny and Gouzos—not defendants).

### C.  Procedural History

Henry filed this lawsuit on August 3, 2017, *see* Compl., ECF No. 1, and subsequently amended its complaint on November 2, 2017, *see* Am. Compl., ECF No. 17. Henry's amended complaint asserts seven causes of action against defendants. Am. Compl. ¶¶ 33–83. The first four claims seek declaratory relief and damages for defendants' failure to abide by their obligations under PACA, which imposes a statutory trust on produce-related assets held by produce buyers. *Id.* ¶¶ 33–63. Plaintiff also asserts a state-law claim for breach of contract against defendants, arguing that Z.J.D. failed to perform under its contract to purchase avocados from Henry. *Id.* ¶¶ 64–68. Finally, plaintiff's last two claims seek to hold Chen individually responsible for breaching his obligations under PACA. *Id.* ¶¶ 69– 83.

On December 19, 2017, I denied defendants' motion to dismiss after finding that the motion raised "factual disputes that are not yet ripe to be decided at the stage of a motion to

dismiss." *Henry Avocado Corp. v. Z.J.D. Brother, LLC*, No. 17-cv-4559 (ARR), 2017 WL 6501864, at *1 (E.D.N.Y. Dec. 19, 2017). In January 2018, defendants answered the amended complaint and filed a third-party complaint against Johnny Avocado, Inc. and John Gouzos, seeking indemnification and asserting several additional causes of action, including breach of contract and fraud. *See* Answer, ECF No. 29; Third-Party Compl., ECF No. 31. After Johnny and Gouzos both failed to answer or otherwise appear in this action, defendants requested and received a certificate of default against the third-party defendants pursuant to Federal Rule of Civil Procedure 55(a). *See* ECF Nos. 43, 46.[6] Both parties cross-moved for summary judgment on plaintiff's claims, and their motions were fully briefed on March 9, 2019.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A material fact is one that "can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In performing this analysis, I must resolve all

---

[6] Defendants argue that the default of third-party defendants Johnny and Gouzos should have a preclusive effect on Henry's lawsuit and thus entitles defendants to judgment as a matter of law against Henry. *See* Defs.' Br. 8, ECF No. 58-2. As Henry argues in response, however, this assertion is both premature and inaccurate. *See* Pl.'s Opp'n 7–9, ECF No. 61. Here, defendants have not yet moved for a default judgment against the third-party defendants; they have received only a certificate of default, which is just the first step in the two-step process for obtaining a default judgment. *See* Fed. R. Civ. P. 55. Moreover, both forms of preclusion—issue preclusion and claim preclusion—require a "valid and final judgment." *Umar Oriental Rugs, Inc. v. Carlson & Carlson, Inc.*, 757 F. Supp. 2d 218, 226 (E.D.N.Y. 2010) (quoting *Leather v. Ten Eyck*, 180 F.3d 420, 424 (2d Cir. 1999)) (describing *collateral estoppel*, or issue preclusion); *see also id.* at 224 ("Under the doctrine of *res judicata*, otherwise known as claim preclusion, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" (emphasis omitted) (quoting *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999))). Plaintiff also argues that a default judgment can never have preclusive effect "[b]ecause 'no issues are actually litigated in a proceeding that results in a default judgment.'" *See* Pl.'s Opp'n 8 (quoting *Super Star Sneakers & Sports, Inc. v. Bata Shoe Co.*, 508 F. Supp. 260, 262 (E.D.N.Y. 1981)). In any case, the doctrine of preclusion is inapplicable at this stage of the litigation, as no judgment has been rendered against any party and no issues have been decided.

ambiguities and draw all inferences in favor of the non-moving party. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). "If, in this generous light, a material issue is found to exist, summary judgment is improper, and the case must proceed to trial." *Nationwide Life Ins. Co v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985)).

The moving party may demonstrate that there is no genuine dispute "by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223–24 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the moving party meets this burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998). "Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact." *Bacchus Assocs v. Hartford Fire Ins. Co.*, 766 F. Supp. 104, 108 (S.D.N.Y. 1991). If "no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). (quoting *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

Where, as here, both parties have moved for summary judgment, the court must examine each party's motion on its own merits and draw all inferences against the moving party. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "[T]he fact that both parties have moved . . . does not mean that the Court must grant summary judgment for one of the parties, and it does not change the burden on the moving party to show the absence of a genuine issue of fact." *Wagner v. County of Cattaraugus*, 866 F. Supp. 709, 714 (W.D.N.Y. 1994).

## DISCUSSION

I.      **The Perishable Agricultural Commodities Act**

"Congress enacted PACA in 1930 to regulate the sale and marketing of produce in interstate commerce." *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33, 36 (2d Cir. 2004). The statute was amended in 1984 to establish the trust provisions that are at issue in this lawsuit. *Id.* at 37. Specifically, PACA provides that a "commission merchant, dealer, or broker" who receives "perishable agricultural commodities" is required to hold those goods, or their proceeds, in trust for the benefit of any unpaid seller or supplier involved in the transaction. 7 U.S.C. § 499e(c)(2). Congress's goal in enacting this section was to provide sellers of agricultural commodities with additional protections in a marketplace that required sellers to "sell their produce quickly" to purchasers who frequently paid them only after the produce was received. *Am. Banana Co.*, 362 F.3d at 37. As a result, prior to the creation of the trust provisions, produce sellers often found themselves uncompensated for produce that had already been sold and that perished soon after it was delivered. *Id.*

PACA addresses this problem by making "sellers' interests in the commodities and sales proceeds superior to those of the buyers' creditors, including secured creditors." *Id.* In order to demonstrate a claim to the proceeds from a PACA-created trust, a plaintiff must show five things:

> (1) the commodities sold were perishable agricultural commodities; (2) the purchaser of the perishable agricultural commodities was a commission merchant, dealer or broker; (3) the transaction occurred in interstate or foreign commerce; (4) the seller has not received full payment on the transaction; and (5) the seller preserved its trust rights by giving written notice to the purchaser within the time provided by the law.

*A & J Produce Corp. v. Chang*, 385 F. Supp. 2d 354, 358 (S.D.N.Y. 2005) (citing 7 U.S.C § 499e). The trust "exists for the benefit of all the debtor's unpaid produce suppliers." *William Consalo & Sons Farms, Inc. v. Drobnick Distrib., Inc.*, No. CV-10-049-TUC-CKJ, 2011 WL 1211911, at *5 (D. Ariz. Mar. 30, 2011). The statute imposes a "non-segregated floating trust on the commodities and their derivatives, in the sense that it permits buyers . . . to commingle PACA trust assets with

their other assets." *Am. Banana Co.*, 362 F.3d at 38 (citation and internal quotation marks omitted). "Beneficiary claimants have the responsibility of establishing through their business records the details of the transaction on which payment is sought." *Drobnick Distrib.*, 2011 WL 1211911, at *5 (quoting H.R. Rep. 98-543 at 5 (1983)).

Courts vary in the language they use to describe exactly how and when the trust is created. *See, e.g.*, *id.* ("A PACA trust is created upon receipt of produce by a 'commission merchant, dealer, or broker . . . .'"); *Bonell Produce Co. v. Chloe Foods, Inc.*, No. 08-CV-4218 (FB)(CLP), 2008 WL 4951942, at *2 (E.D.N.Y. Nov. 19, 2008) ("[A] PACA trust is automatically established each time a broker or merchant purchases perishable commodities upon credit . . . ." (alteration in original) (quoting *D.M. Rothman & Co. v. Korea Comm. Bank of N.Y.*, 411 F.3d 90, 96 (2d Cir. 2005))); *Horizon Mktg. v. Kingdom Int'l Ltd.*, 244 F. Supp. 2d 131, 135 (E.D.N.Y. 2003) ("Under the statute, the trust is formed at the moment the produce is shipped to the buyer and remains in effect until the seller is paid in full."). Despite these differences, however, PACA clearly applies to situations in which two parties have formed an agreement to provide and purchase perishable commodities; the trust protections exist where one party—the "commission merchant, dealer, or broker"—"receive[s]" the produce from the other party—the "unpaid suppliers or sellers" of the commodities. § 499e(c)(2); *see also* § 499e(c)(1) (observing that the trust subsection "is intended to remedy" the burden on commence caused by a party who fails to make payment "for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person"). By contrast, a party who has not purchased perishable agricultural commodities from the seller is under no obligation to preserve the trust. *Cf. Carter v. Michael Cutler Co.*, No. 1:12CV95, 2013 WL 4788283, at *4 (M.D.N.C. Sept. 6, 2013) (granting a motion to dismiss a claim under a related section of PACA where "[t]he Complaint fails to allege that

Plaintiff was a seller of a perishable commodity which would illustrate an actual transaction between Plaintiff and Defendants"), *adopted by* 2013 WL 12304562 (M.D.N.C. Oct. 18, 2013).[7]

In order to preserve its rights under PACA, a seller must abide by "[s]trict eligibility requirements." *Am. Banana Co.*, 362 F.3d at 42. A seller loses the benefits of PACA unless it "give[s] written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days." § 499e(c)(3). Alternatively, a seller can preserve its statutory trust rights by including specific language on its "ordinary and usual billing or invoice statements." § 499e(c)(4); *see also Belleza Fruit, Inc. v. Suffolk Banana Co.*, No. CV-12-3033 (SJF)(WDW), 2012 WL 2675066, at *7 (E.D.N.Y. July 5, 2012) (describing the "invoice method" for preserving statutory rights).

## A. Factual disputes preclude summary judgment on plaintiff's PACA claims.

Both parties acknowledge that they never formed a written agreement for the avocado orders that are the subject of this dispute: the April 24, 2017 and May 11, 2017 invoices. *See* Pl.'s 56.1 Resp. ¶ 1, ECF No. 61-1 (admitting that Henry's contracts to sell avocados to Z.J.D. were not memorialized in writing).[8] However, the parties vigorously dispute whether Chen's phone calls

---

[7] Plaintiff ignores this element of the PACA trust provisions and argues that Henry is entitled to judgment as a matter of law because all five elements of a PACA trust claim are established. *See* Pl.'s Br. 9–14. Plaintiff is correct that many of these elements do not appear to be genuinely disputed. For example, avocados constitute "perishable agricultural commodities," the transactions occurred in interstate commerce, and Henry has not been paid for the shipments. *See id.*; *see also* Chen Decl. ¶¶ 15–17 (withdrawing paragraphs that previously cast doubt on whether the interactions between the parties met these elements of the PACA trust provision); Chen Decl. ¶¶ 15–17, ECF No. 58-4 (version of declaration that contains the subsequently-withdrawn paragraphs). However, one of the five elements of a PACA claim is that the *purchaser* is a "commission merchant, dealer or broker." Because defendants seriously dispute plaintiff's assertion that they ever purchased goods from plaintiff, this issue must be resolved before summary judgment can be granted to any party.

[8] Defendants suggest that PACA requires an initial contract between a produce purchaser and a buyer to be in writing. *See* Defs.' Br. 2. As plaintiff argues in response, however, *see* Pl.'s Opp'n 3–5, defendants' argument rests on a misinterpretation of the relevant language. The PACA regulations require, as a default rule, that a purchaser of produce pay the seller "within 10 days after the day on which the produce is accepted." 7 C.F.R. § 46.2(aa)(5). Nevertheless, the statute allows parties to agree to an extension of the

with Varvel in the days that preceded both orders established an *oral* sales agreement between the parties. Though few cases involve transactional agreements as convoluted as the situation presented here, the PACA case law demonstrates that an underlying agreement to receive and ship produce is a fundamental element of any PACA trust claim. *See, e.g.*, *Horizon Mktg. v. Kingdom Int'l*, 244 F. Supp. 2d 131, 135 (E.D.N.Y. 2003) (observing that the case presented the question of whether the defendant was a "buyer/trustee," before holding that the evidence demonstrated that

---

payment period—up to thirty days after acceptance—as long as "the parties have expressly agreed to [the extension] in *writing* before entering into the transaction." § 499e(c)(3) (emphasis added); *see also Am. Banana Co.*, 362 F.3d at 43 ("[T]hese regulations require a buyer to pay the seller within ten days after the buyer has accepted the produce, but permit the parties to agree in writing before the transaction to other payment periods that do not exceed thirty days."). Thus, "oral agreements concerning *payment periods* are disregarded for purposes of PACA liability." *Am. Banana Co.*, 362 F.3d at 46 (emphasis added). The statute does not, however, require that initial agreements to sell produce be in writing if the initial agreement does not seek to alter the default payment period. Additionally, PACA requires the language in which a seller preserves its trust rights to be reduced to writing, but it does not require that the underlying agreement to sell goods be written. *See* §§ 499e(c)(3)–(4). Defendants cite one case to support their argument that PACA "requires a written agreement," but that case involved a written agreement to *extend the payment terms*—not the underlying agreement to contract. *See* Defs.' Br. 1 (citing *In re Lombardo Fruit & Produce Co.*, 12 F.3d 806, 809–10 (8th Cir. 1993)). Though courts and the Secretary of Agriculture may have a preference for written contracts, *see, e.g.*, *Rothenberg v. H. Rothstein & Sons*, 183 F.2d 524, 526 n.5 (3d Cir. 1950) ("As the written contract is usually more susceptible to proof . . . it is desirable to have a signed contract."), there is no evidence that a written contract is required to enforce a PACA trust. *See, e.g.*, *Sawyer v. Paskoff*, 74 F. Supp. 24, 25 (W.D. Pa. 1947) (denying defendants' motion for a new trial under PACA where "[t]he plaintiff in each case made an oral contract" to sell potatoes to defendants).

Moreover, even if a written contract *was* required to enforce the PACA trust provisions, plaintiff need only demonstrate that the contract meets the requirements of the New York statute of frauds. *See, e.g.*, *Rothenberg*, 183 F.2d at 526 (explaining the "general proposition" that "the law of the state [whose] rules . . . would be applicable under the conflict of laws" should be applied in a PACA case where the federal statute itself "do[es] not provide a rule for its solution"). There is some uncertainty whether a state-based statute of frauds could ever be used to invalidate a contract under PACA. *See id.* at 529 (declining to apply the Pennsylvania statute of frauds to a reparation proceeding under PACA after holding that Pennsylvania's statute of frauds was a procedural, rather than substantive, rule, and, accordingly, it should not be used to invalidate a contract under the federal statute); *see also United Potato Co. v. Burghard & Sons, Inc.*, 18 F. Supp. 2d 894, 898 (N.D. Ill. 1998) (describing *Rothenberg* as holding that a state's statute of frauds provision "has no effect before a district court in a PACA case" if the statute of frauds in that state imposes no *substantive* requirements and instead "simply precludes enforcement of a contract in the state courts"); *Warner Bros. Pictures, Inc. v. Simon*, 241 N.Y.S. 2d 914, 915 (Sup. Ct. 1963) (observing that the question of whether the statute of frauds in New York is substantive or procedural "has not yet been settled"). Nevertheless, if New York's statute of frauds did apply to this case, the combination of an oral agreement and the invoices sent by plaintiffs would be sufficient to satisfy the "merchants exception" of N.Y. U.C.C. Law § 2-201(2), which would apply since this is a contract for goods; *see infra* Discussion section part II.

the defendant had contracted for the goods); *Drobnick Distrib.*, 2011 WL 1211911, at *1, *7 (evaluating a PACA claim where the defendants "dispute that they purchased produce from Plaintiff," before holding that the evidence in that case sufficiently demonstrated that the defendants "effectuated a sale of the produce . . . , thereby gaining an ownership interest of that produce"); *Hat Trick Premium, L.L.C. v. Borton & Sons, Inc.*, No. 28826-9-III, 2010 WL 5298755, at *3, *6 (Wash Ct. App. Dec. 28, 2010) (affirming an order granting summary judgment to defendants in a PACA trust case where there was no evidence of an agreement between the parties to provide produce to defendants); *see also id.* at *5 (explaining that one party's "unilateral invoicing" of the other party does not—absent an initial agreement for the defendant to become a purchaser—demonstrate that there is a contract for the sale of produce).

A close analysis of the statutory and regulatory language also confirms that Z.J.D. and Chen can be held liable for breaching the PACA trust only if they purchased the underlying goods. *See, e.g.*, § 499e(c)(1) (providing that the act applies to "commission merchants, dealers, or brokers[] who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled on behalf of another person"); 7 C.F.R. § 46.2(m) (defining a "dealer" as "any person engaged in the business of buying or selling [produce] in wholesale or jobbing quantities"). Moreover, because "state law provides the rule of decision" in a situation where "PACA is silent on a matter," *S & S Packing, Inc. v. Spring Lake Ratite Ranch, Inc.*, 702 F. App'x 874, 878 (11th Cir. 2017), New York's Uniform Commercial Code—which applies to sales of goods in New York—provides a helpful background for the parties' underlying agreements in this case. *See, e.g.*, N.Y. U.C.C. Law § 2-103(1)(a) (defining a "buyer" as "a person who buys or contracts to buy goods"); N.Y. U.C.C. Law § 2-204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement"); *see also In re W.L. Bradley Co.*, 75

B.R. 505, 510 (Bankr. E.D. Pa. 1987) (noting that "supplier," "seller," and "agent" are not defined in PACA before citing the general principle that "courts . . presume that the legislative purpose is expressed by the ordinary meaning of the words used"). Though the requirements for contract formation are not stringent, it is clear that a PACA trust will be established only where the parties made some agreement—however informal—to buy and sell produce. Here, the disputed facts regarding the parties' underlying expectations, communications, and intentions are far too numerous to warrant judgment in favor of either party on this issue.[9]

When viewing the facts in the light most favorable to plaintiff, Chen's phone calls with Varvel established an oral agreement for Z.J.D. to purchase large quantities of avocados and receive the avocados at a third party's address. Varvel asserts that he spoke with Chen twice before the April 24, 2017 order and once before the May 11 order to confirm that Chen wanted to place avocado orders that would be shipped to Johnny's address in New York. *See* Varvel Decl. 1 ¶ 28. The phone records between the parties' two cell phone numbers also confirm the timing and length of these calls. *Id.*; Phone Records. Furthermore, Varvel asserts that the calls coincide with the avocado-sourcing timeline, and that the orders were not placed until after Varvel had confirmed with Chen that he wished to receive the avocados. Varvel Decl. 1 ¶ 28. Plaintiff also alleges that Chen had previously directed that the avocados be shipped to Johnny, *see id.* ¶ 13; *see also id.* ¶ 22 (noting that "[i]t is not uncommon for produce buyers to direct their suppliers to ship to third parties"), further indicating that Chen was aware that the produce was being sent on his behalf. Finally, Brownell asserts that she spoke with Chen after receiving his credit form, and that she

---

[9] As I explain below, both parties acknowledge that the invoices—which list Z.J.D. as the purchaser of the avocados—are not sufficient to demonstrate that an agreement was made between the parties. *See, e.g.*, Pl.'s Opp'n 9. If, however, there was a prior oral agreement to purchase the avocados, the invoices would constitute confirmatory memoranda sufficient to satisfy the statute of frauds—if the statute of frauds were applicable in this case. *See infra* Discussion section pt. II; *supra* note 8.

informed him that Z.J.D. was authorized to purchase avocados directly from Henry. *See* Brownell Decl. ¶ 14. These facts collectively suggest that Chen personally ordered avocados on behalf of Z.J.D. and is liable for failing to pay Henry for the cost of those shipments. Unlike the situation presented in *Hat Trick Premium, L.L.C. v. Borton & Sons, Inc.*—a case upon which defendants rely—Henry's version of the oral agreements between the parties is specific and grounded in evidence. 2010 WL 5298755, at *4 (affirming an order granting summary judgment to defendants in a PACA case where the only evidence to suggest an oral agreement between the parties was the plaintiff's affidavit, which presented only "[c]onclusory," unsupported, and implausible "statements of fact").

At the same time, however, the facts present a completely different picture of the underlying transactions when viewed in the light most favorable to defendants. According to Chen, the April 24 and May 11 orders were both placed without any involvement or awareness on the part of Chen or Z.J.D. Chen asserts that Johnny placed both orders without consulting him, and he argues that he never spoke with anyone at Henry about ordering avocados on his credit. Chen presents a plausible explanation for his phone calls with Varvel—he alleges that he spoke with Varvel several times to confirm the price that Henry was charging Johnny for avocados, rather than to place his own orders for avocados. *See* Chen Dep. 60:11–25. Chen also suggests that Henry was aware of Z.J.D.'s arrangement with Johnny, and that Henry informed Chen that Z.J.D. could not order avocados directly from Henry. *See id.* 65:12–66:15. Construing these facts in the light most favorable to defendants, Chen and Z.J.D. were misled and exploited by Johnny, and Johnny—rather than defendants—is responsible for the overdue payments. Though Chen's description of the relevant facts suggests that he should have been more careful when transacting with Johnny,

*see, e.g.*, Chen Dep. 43:9–46:4 (admitting that he signed the Customer Information Sheet without reading it), he adamantly disputes that he ever ordered avocados directly from Henry.

Plaintiff suggests that its claims can be resolved as a matter of law because there is sufficient evidence that defendants received and accepted the produce. *See* Pl.'s Opp'n 6–7. Both parties are correct that "receipt" of the produce is a necessary prerequisite of a PACA trust claim, and evidence of a party's "receipt" may be sufficient to imply the existence of an underlying agreement. *See, e.g.*, § 499e(c)(2) (establishing a PACA trust where the agricultural commodities are "received by a commission merchant, dealer, or broker in all transactions"); *see also Six L's Packing Co. v. Beale*, 524 F. App'x 148, 152 (6th Cir. 2013) (crediting defendants' contention that "the Act only activates when a commission merchant 'received' the produce"). The buyer's "acceptance" of the produce is also a necessary element of a PACA trust claim, as "acceptance" of the goods triggers the buyer's obligation to pay. *Six L's Packing Co.*, 524 F. App'x at 153 (observing that the regulations require a purchaser to make "full payment promptly" "within 10 days after the day on which the produce is *accepted*" and noting that the statute "prohibits a dealer from rejecting [the produce]" after it has been accepted) (emphasis added).

In this case, however, there are also disputed facts about whether defendants actually received or accepted the avocados from Henry, rather than from Johnny. Under the statute, produce is "received" when the buyer "gains ownership, control or possession of the perishable agricultural commodities." *Drobnick Distrib.*, 2011 WL 1211911, at *7 (emphasis omitted) (quoting 7 C.F.R. § 46.46(a)(1)). "Actual physical possession is not a prerequisite for liability under PACA." *Id.* If plaintiff's version of the facts is credited, defendants took ownership and control of the avocados— and thus "received" the produce—when Chen directed Varvel to send the first shipment and all subsequent shipments of avocados to Johnny's address. *See* Pl.'s Opp'n 7; *see also Six L's Packing*

*Co.*, 524 F. App'x at 152 ("[Defendant] gained ownership and control over the trust assets (the produce) once the tomatoes were harvested, gas-ripened, and stored at its behest."). Defendants, however, dispute that this conversation ever took place. *See* Chen Dep. 53:8–13. As a result, there is a genuine dispute of fact regarding whether defendants received the avocados, even though it is undisputed that defendants never took physical possession of the full shipment.

For the same reasons, there are disputes regarding whether defendants "accepted" the avocados. Under the regulations, "acceptance" can be established in several ways, including "[a]ny act by the consignee signifying acceptance . . . , including diversion or unloading," "[a]ny act by the consignee which is inconsistent with the consignor's ownership," or the "[f]ailure of the consignee to give notice of rejection" of the goods to the consignor. 7 C.F.R. § 46.2(dd). If plaintiff's version of the facts is credited, defendants received the avocados when they diverted the goods to Johnny's warehouse. *Cf. Food Team Int'l, Ltd. v. Unilink, LLC*, 872 F. Supp. 2d 405, 425–26 (E.D. Pa. 2012) (concluding that "the undisputed record evidence demonstrates that [defendant] accepted the produce" by "unloading the shipments . . . and storing the produce in its cold storage facility"). If, however, defendants' version is credited, defendants had no notice, knowledge, or awareness that the goods were being ordered on defendants' credit; thus, defendants did not perform any act that would constitute "acceptance" of the goods.

Ultimately, "[t]his dispute and these motions underscore two basic legal truths: First, they highlight the legal peril created by reliance upon alleged oral agreements . . . and, second, they illustrate the limits of a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure as a vehicle for resolving alleged oral contractual claims that turn on competing recollections of disputed conversations." *Int'l Auction & Appraisal, LLC v. R & M Metals, Inc.*, No. 1:09-CV-1639, 2010 WL 4181457, at *1 (M.D. Pa. Oct. 20, 2010); *see also Hat Trick*

*Premium, L.L.C.*, 2010 WL 5298755, at *6 (observing that "disputes about oral contracts are generally not appropriate for summary judgment"). Because the court cannot resolve these disputed issues without assessing the credibility of the witnesses—a task that is inappropriate on a summary judgment motion, *id.*—both parties' motions for summary judgment must be denied.

## II.      Breach of Contract Claim

Plaintiff's fifth claim asserts that defendants breached their contract to purchase avocados from Henry on April 24 and May 11. *See* Am. Compl. ¶¶ 64–68. Under New York law, "[t]o establish a *prima facie* case for breach of contract, a plaintiff must plead and prove (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). A contract is established where there is a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Robison v. Sweeney*, 753 N.Y.S.2d 583, 586 (App. Div. 2003) (quoting *Matter of Express Indus. & Term. Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)). "As with any contract, an oral agreement is not enforceable unless" there is evidence that the parties both assented to the terms of the contract. *Kelly v. Bensen*, 58 N.Y.S.3d 169, 172 (App. Div. 2017). Though a valid agreement will not be invalidated simply because one party develops a "mistaken understanding of the legal effect of the agreement" *after* it is already formed, *Zacharius v. Kensington Publ'g Corp.*, 90 N.Y.S.3d 25, 27 (App. Div. 2018), a genuine language barrier that effectively vitiated "mutual assent between the[] parties" can defeat the enforceability of a contract, *Orient Mineral Co. v. Bank of China*, No. 2:98-CV-238BSJ, 2010 WL 624868, at *21 n.49 (D. Utah Feb. 19, 2010); *see also* Chen Dep. 4:23–25, 34:14–19 (explaining that he speaks only "plain simple English" while also affirming that he spoke with John Gouzos in English).

In this case, the same core dispute regarding the existence of an agreement to sell and purchase avocados defeats both parties' motions for summary judgment on this claim. Based on plaintiff's version of the facts, the parties established an oral contract by phone that was then confirmed when plaintiff mailed Z.J.D. the invoices. The invoices would be sufficient to satisfy New York's statute of frauds, because both parties are merchants and defendants did not object to the contract after the invoices were mailed. *See* N.Y. U.C.C. Law § 2-201(2) (providing an exception to the statute of frauds in a sale between merchants where the seller sends a "writing in confirmation of the contract and sufficient against the sender" to the buyer "within a reasonable time" after the establishment of an oral agreement, and the buyer does not object in writing within ten days); *Multiex USA, Inc. v. Marvin Knitting Mills, Inc.*, 784 N.Y.S. 2d 506, 507 (App. Div. 2004) (holding that "invoices confirming the agreements made between [the parties] constituted confirmatory writings in accordance with the merchants exception").[10]

Taking the facts in the light most favorable to defendants, however, there was never an oral contract to sell goods, and therefore defendants cannot be held liable for breach of contract. As

---

[10] Defendants argue that the fact that the invoices are not signed by any individuals who work for Henry renders them invalid as confirmatory agreements. *See* Defs.' Br. 10–11 (citing Corbin, *The Parol Evidence Rule*, 53 Yale L.J. 603, 645 (1944)). However, a physical signature is not necessary for a document to be "sufficient against the sender." *See Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 386 (S.D.N.Y. 2005). To the contrary, electronic signatures, stamps, and other forms of authentication satisfy the merchants exception to the statute of frauds. *Id.* at 387 (citing N.Y. U.C.C. Law § 1-201); *see also H.Daya Int'l Co. v. Arazi*, 348 F. Supp. 3d 304, 310 (S.D.N.Y. 2018) (holding that an invoice written on letterhead of the seller, containing the address and names of both parties, was sufficient to meet the requirements of the "merchants exception") (citing *B & R Textiles Corp. v. Domino Textiles Inc.*, 430 N.Y.S.2d 89, 90 (1980)). Moreover, the fact that Chen asserts that he never received the invoices in the mail is immaterial. "[W]here, as here, there is proof of an office procedure that is followed in the regular course of business, and these procedures establish that the required letters or notices have been properly addressed and mailed, a rebuttable presumption arises that the letter or notice was actually received by the person to whom it was addressed." *Yesh Music, LLC v. Amazon.com, Inc.*, 249 F. Supp. 3d 645, 653 (E.D.N.Y. 2017) (citing *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993)); *see also* Varvel Decl. 1 ¶¶ 30–31 ("All of Henry Avocado's invoices for each of the shipments were sent by mail in the ordinary course of Henry Avocado's business procedures. Neither of the invoices . . . was returned to Henry Avocado as 'undeliverable.'").

defendants point out, the fact that a confirmatory invoice was mailed does not demonstrate that an initial agreement was made; the "plaintiff still has the burden of proving the alleged agreement," even if the writings that were exchanged were sufficient to defeat a statute of frauds defense. *Bazak Int'l Corp. v. Mast Indus., Inc.*, 535 N.E.2d 633, 635 (N.Y. 1989); *see also Genecco Produce, Inc. v. Sol Grp. Mktg. Co.*, No. 04-CV-6282 CJS, 2006 WL 328385, at *4 (W.D.N.Y. 2006) ("[A] failure to make written objection to a confirmatory writing does not bind the receiving party to the *terms* of the writing."). Because there are genuine questions regarding the establishment of a contract that cannot be resolved on a motion for summary judgment, both parties' motions are denied as to this claim.[11]

## III.    Chen's Individual Liability

Plaintiff's final two claims assert that Chen, as the owner of Z.J.D., can be held individually liable for Z.J.D.'s breach of the PACA trust provisions. *See* Am. Compl. ¶¶ 69–83. Both parties have moved for summary judgment on these claims, and plaintiff argues that it is entitled to partial summary judgment on the issue of Chen's liability, even if disputed facts preclude the granting of summary judgment as to Z.J.D.'s liability. *See* Pl.'s Br. 16–17. "An individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act." *Belleza Fruit*, 2012 WL 2675066, at *9 (quoting *Hiller Cranberry Prods., Inc. v. Koplovsky*, 165 F.3d 1, 8–9 (1st Cir. 1999); *see also Horizon Mktg.*, 244 F. Supp. 2d at 145 (holding that an individual who is a principal

---

[11] Defendants also argue that they are entitled to judgment on this claim because they contracted with Johnny, who was an agent of Henry, and they performed all of their obligations under their agreement with Johnny. *See* Defs.' Br. 16–18; *see also* Chen Dep. 71:12–21. This argument fails because plaintiff adamantly disputes that it ever communicated that Johnny was its agent, *see* Varvel Decl. 2 ¶¶ 12–13, and an agency relationship cannot be formed unless there is a "manifestation by the principal that the agent shall act for him." *Vornado Realty Trust v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 280 (E.D.N.Y. 2013) (quoting *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 89 (S.D.N.Y. 2010)).

in a corporation that "bought produce, but failed to pay, [can be held] individually liable for breach of their fiduciary duties").

It is undisputed that "Chen was the President and principal shareholder of Z.J.D." at all relevant times. Defs.' 56.1 Resp. ¶ 5. However, the fact that an individual holds 100% of stock in a company does not automatically mean that the individual is liable for the company's breach of the PACA trust. *See Mid-Valley Produce Corp. v. 4-XXX Produce Corp.*, 819 F. Supp. 209, 213 (E.D.N.Y. 1993). If the facts ultimately give rise to a finding at trial that Z.J.D. bought the avocados from Henry and failed to comply with its obligations under PACA, then there may be sufficient facts to hold Chen secondarily liable for these violations. However, given the numerous disputed facts here regarding every element of the underlying transactions, it is premature for me to resolve this issue. Though Chen admitted that he is the "sole owner of the company," and that he makes all decisions for the company, *see* Chen Dep. 7:11–8:2, ECF No. 59-1, the disputed facts preclude a finding at this time regarding Chen's specific role in Z.J.D.'s possible breach of the PACA trust, thus defeating the parties' motion for summary judgment on this claim. *See also G & P Warehouse, Inc. v. Cho's Church Ave Fruit Market Inc.*, No. 15 CV 6174 (NG)(CLP), 2016 WL 5802747, at *5 (E.D.N.Y. Aug. 12, 2016) (granting a default judgment to plaintiff where the allegations indicated that the individual defendants not only were "officer[s] and principal[s]" of the corporate entity, but that they were also specifically in "position[s] of control over the PACA trust assets" (alterations in original) (citing complaint)).[12]

---

[12] The parties also dispute the legality of the 18% interest rate specified on defendants' invoices. *See* Defs.' Br. 24–25 (arguing that the interest term is void); *see also* Pl.'s Opp'n 14–15 (citing cases that have enforced the same interest rate). Though I need not decide this question now, I note that courts have routinely held that interest rate provisions count as "additional terms" to a contract when they are added to confirmatory memoranda such as invoices, and a rate that is "within the range of trade practice" does not constitute a "material alteration" sufficient to defeat an otherwise enforceable agreement. *See, e.g.*, *Tomato Mgmt. Corp. v. CM Produce LLC*, No. 14-CV-3522 (JPO), 2014 WL 2893368, at *2 (S.D.N.Y. June 26, 2014) (quoting N.Y. U.C.C. Law § 2-207, cmt.5)).

## CONCLUSION

For the reasons stated in this opinion, disputed issues of material fact preclude a determination of liability on all of plaintiff's claims. Accordingly, the parties' cross-motions for summary judgment are denied. The court strongly recommends that the parties schedule a settlement conference before Magistrate Judge Mann in an effort to resolve this lawsuit prior to trial. However, if they are unable to do so, the trial will begin with jury selection on May 28, 2019, and it will proceed without interruption until completion. Given the legal and factual complexities in this case, the parties are also strongly advised to consider proceeding to a bench trial instead of a jury trial.

The parties must submit a joint pre-trial order that complies with the court's individual practices and rules by **May 1, 2019**, including joint proposed jury instructions. At the same time, each party must also provide the court with two bound copies of their trial exhibits and all fully-briefed motions *in limine*.


SO ORDERED.


Date:   April 12, 2019                                  _____/s/_____
        Brooklyn, New York                             Allyne R. Ross
                                                        United States District Judge